F. E. RUBBERT, Appellant, v. ILLINOIS CENTRAL RAILROAD COMPANY et al., Appellees.

EVIDENCE: Conspiracy—Declarations of Co-Conspirators—Foundation. Evidence reviewed, and *held* to establish a prima-facie conspiracy sufficiently to render admissible against plaintiff the declarations of a co-conspirator.

1

EVIDENCE: Res Gestae—Series of Connected Acts. *Res gestae* may embrace a series of connected acts extending over a considerable period of time.

2

*Appeal from Cherokee District Court.*—WILLIAM D. BOIES, Judge.

SATURDAY, FEBRUARY 19, 1916.

ACTION at law to recover damages for false arrest and malicious prosecution. All issues were submitted to a jury, and a verdict was returned for the plaintiff upon Count One

of his petition for $1.00, and against him upon Count Two. The plaintiff appeals.—*Affirmed*.

*McCulla & McCulla, Faville & Whitney,* and *Healy, Burnquist & Thomas,* for appellant.

*Molyneux & Maher* and *Helsell & Helsell,* for appellees.

PRESTON, J.—The first count of the petition alleges that, on December 17, 1911, plaintiff was falsely arrested and detained at Fort Dodge, Iowa, when traveling as a passenger on defendant's railroad. The second count alleges that, on said date, defendants procured his arrest upon a charge of disorderly conduct; that he was prosecuted in the police court and convicted, and upon appeal to the district court, was acquitted.

The answer is: First, a general denial; and second, that plaintiff, with others, was on said date shipping stock over defendant's railroad from Marcus, Iowa, to Chicago, and that they had transportation over said railroad in the form of stock contracts, which permitted them to ride only on the stock train; that when they arrived at Fort Dodge, they maliciously and illegally combined and conspired together to abandon the stock train, to go upon the passenger train, and by force of numbers compel the defendant company to carry them on said passenger, without other or further charge or other ticket; that they were trespassers on said train; that, when defendants Core and Gressly attempted to remove them from said train they were guilty of much disorderly conduct; that they were arrested by the police officer, and that defendant company did not authorize their arrest. They further plead that plaintiff did not legally appeal his case from the police court; that the case was never tried nor heard, and that he was never legally acquitted; and further, that probable cause existed for the arrest and prosecution of plaintiff. In a third division of the answer, defendants plead that the plaintiff and his associates were, in fact, guilty of disorderly conduct and subject to legal arrest.

Plaintiff is a farmer and engaged in the business of shipping stock from Marcus, Iowa, on the Illinois Central Railroad. On December 17, 1911, plaintiff, in company with several other stockmen, shipped a trainload of stock from Marcus to Chicago. There were 22 to 24 stock shippers in the company, of whom plaintiff was one. They rode in the caboose of said freight train from Marcus to Fort Dodge, where they arrived a few minutes past five o'clock on the morning of December 17th. Upon their arrival at Fort Dodge, they left the caboose and went out to obtain their breakfast. A part of them ate breakfast at a restaurant on the corner north of the depot, and others ate breakfast at the lunch counter in the railroad station. After breakfast, plaintiff, with others, started to the railroad yards and met other members of the company, and together they went to the office of the yardmaster of defendant company, for the purpose of inducing the company to add another caboose to their train, because the one on which they had ridden from Marcus was too small to accommodate the large number of stockmen. From the yardmaster's office, they went to the trainmaster's office, for the same purpose. An extra caboose could not be provided at Fort Dodge, and the stockmen were so informed, but they were told that an effort would be made to get one at Waterloo. About this time, or soon after, the stock train pulled out of the station at Fort Dodge, and some of the stockmen got on it. About 12 were left at the station. The 12 who were left observed a passenger train standing on the track, about to depart for Chicago. Plaintiff, with the others, boarded one of the coaches on the passenger train. They were informed that their transportation was not good on the passenger train, and they refused to pay fare and were put off by the police.

The errors relied upon relate to the admission of evidence of declarations of witnesses Downs, Booth, Hanson and Fuller as to the purpose of the stockmen to ride on the passenger train without tickets or paying fare. The record as to the testimony of Downs is as follows:

"Q. Tell the jury, in your own way, all the conversation you heard with these stockmen. . (Objected to as immaterial, as hearsay, and it does not appear to have been in the presence of the plaintiff. Court: Overruled and the plaintiff excepts.) A. I heard part of it, yes, sir. Q. Tell the jury, in your own way, all the conversation you heard there with the stockmen. (Objection overruled and the plaintiff excepts.) Court: You may tell what you heard Mr. Hobbs say or the plaintiff, or anyone in this party, but you cannot testify as to what some of the stockmen might have said, who were strangers to this party, who we have been inquiring about. You will have to confine your answer to this party of men you have been questioned about. Q. Will you relate to the jury, the conversation that took place between those stockmen that went to the lunch counter with Hobbs? (Same objection. Overruled and plaintiff excepts.) A. Well, there was talking going on, and one of the fellows spoke up and said that they didn't like the accommodations they had, and something was said about getting a caboose, or a coach put onto the train, getting it to ride in, and said if they couldn't get that, they would ride on the passenger train, and they were going to ride on the stock contracts. Which of the men said this I can't say. One of them said they were going to ride on the passenger train on their stock passes, and they weren't going to buy any tickets."

The record as to the testimony of Booth is as follows:

"Q. Now, if you heard any conversation that took place between those men there that morning, I wish you would relate it. (Objected to as irrelevant, immaterial, incompetent and hearsay, and not shown to have been in the presence of, or communicated to the plaintiff, and not binding on him. Overruled and the plaintiff excepts.) A. I heard one of them say that they would go down and see about getting another car as there wasn't room enough on the one which they came in on, and that if they couldn't furnish them one,

that they would ride on the passenger train on their transportation.''

The record as to the testimony of Hanson is as follows: ''Q. What were they saying? (Objected to as incompetent, immaterial and irrelevant, hearsay, and not shown to be in the presence of the plaintiff. Overruled and plaintiff excepts.) A. They said that if they didn't get better accommodations they were going to ride this passenger train out of Fort Dodge on their stock contracts.''

The testimony of the witness Fuller was not objected to when it was received, because he stated that plaintiff was present in the crowd at the time the declaration he testified to occurred. It is said by appellant that later in his testimony, he retracted his statement that plaintiff was present. After reading his testimony, there is considerable doubt in our minds whether he did retract this statement. It was, to be sure, weakened to some extent, but, taking it altogether, it is not clear that he did say, later in his testimony, that plaintiff was not present at the conversation to which Fuller testified.

It is contended by appellant that plaintiff was not present at the time any of the declarations of the alleged conspirators with him were made, and that the evidence is undisputed that he was not present. We have not been favored with an argument by counsel for appellee, and have been compelled to search the record ourselves, unaided, to determine the questions of fact in the case. After reading the record, we think there was a conflict in the evidence on the proposition as to whether plaintiff was present. In addition to the testimony of Fuller, before referred to, we find in the testimony of witness Booth that he testified that he was a brakeman for defendant company and on duty at Fort Dodge on the morning of December 17th; that he was at the depot in the morning when some of the stockmen came in; that he changed the caboose that they came in on and went to the

depot to get warm; that it was between 5:30 and 6:00 o'clock in the morning; that the train they came in on was the only stock train in the yards at that time. He says:

"I had seen those stockmen in front of the yard office that morning, and to the best of my judgment, I think they were the same stockmen."

There is no conflict in the testimony that plaintiff was with the stockmen at the yard office that morning. There may be other evidence on this point, but we think this is enough to make a conflict in the evidence as to whether plaintiff was present when some of the declarations, at least, were made, and tends also to show that plaintiff and the other stockmen were acting together and in combination before any of the alleged declarations.

The principal contention of appellant is that, before evidence of the declarations of a co-conspirator against his alleged confederate is admissible, it is necessary to lay a proper foundation and to first establish *prima*

1. EVIDENCE: conspiracy: declarations of co-conspirators: foundation.

*facie* the existence of the conspiracy, and that the declarations of parties alleged to be engaged in a conspiracy are not admissible to prove the existence of the conspiracy; that such declarations are mere hearsay; and they cite a number of authorities to sustain the proposition. But we think there is evidence in the record sufficient to show, *prima facie*, the existence of the combination or conspiracy, and that plaintiff and the others were acting together, prior to the time when the declarations of alleged co-conspirators were made. We shall not attempt to set out the evidence at this point at any length, but it appears that all of the 22 or 24 stockmen on the caboose were dissatisfied with the accommodations before they reached Fort Dodge; that they sent a telegram, before reaching Fort Dodge, to either the trainmaster or yardmaster, in regard to the company's furnishing another caboose; that the matter was discussed more or less, and that they all went to the office of the yardmaster and train dispatcher, and, as we understand the

record, these transactions all took place before any of the declarations testified to were made.

Witness Hobbs testifies:

"When we reached Fort Dodge, we left the caboose, and I went to the lunch counter in the depot. After I left the depot, I started toward where our caboose was, and met two stockmen coming back from it, and I came back to the depot, and then went to the assistant yardmaster's office. I met. Mr. Rubbert (plaintiff) and his party coming from their breakfast, when we were going to the yardmaster's office. We had sent him a telegram, and asked him if he had received it. He said he had, and also, they had nothing in the yard for us. Told us to go and see the train dispatcher. We went from the train dispatcher's office to the yardmaster's office. Rubbert (plaintiff) was along with us, and from there we went up toward the depot, and saw a passenger train standing there. We all got onto the smoking car of that train."

Witness Fuller testifies that he came into Fort Dodge from the east on the morning of December 17th, and arrived there about 3:30 in the morning:

"I saw some of the stockmen in the depot; I saw them once before that morning. It was a little after five when I saw them in the waiting room. They were getting breakfast. They were dissatisfied with the accommodations on the train they had come in on. Mr. Hobbs, Mr. Williams, Mr. Bryant and Mr. Rubbert, and Mr. Ducommon were in the depot that morning. They were all together. The first conversation to attract my attention was the talk about the accommodations and that they intended or wished to get a special car or caboose on that train from there to Chicago, and some of the parties spoke up and said for two or three of the men to arrange for having this car put onto the train, and another suggested that it would be useless for two or three to go, but the whole crowd had better go and that they would come nearer to getting what they wanted, so they went out of the depot and later they came back, and were talking to them-

selves, and were apparently dissatisfied and said that they were unable to get their car, and that they would get on and ride the passenger out, that it would go out soon.''

In his testimony on cross-examination, from which it is claimed by appellant that this witness retracted, he said:

''I named Rubbert as one of the men that I saw in the depot before recess, I saw Rubbert in the depot that morning but I can't say whether he was in there the first time that they were eating lunch. I can't say that Rubbert was there with the stockmen the second time they came into the depot, before the trouble at the car. I wouldn't swear that Rubbert was in the depot at any time, prior to the transaction at the car. Part of the talk I heard was while they were eating breakfast, and part was after they had breakfast, and part was after they came back the second time.''

Witness Downs testifies, before that part of his testimony heretofore set out, which it is claimed was erroneously admitted:

''I was counterman in the restaurant in the depot on December 17th. I recognized Joseph Hobbs at the counter that morning. There were others with him, but I don't know who they were. They all came in together. I think there were eight or ten of them. It was before six o'clock in the morning.''

Booth's testimony as to seeing these parties in the morning has already been set out. Witness Hanson testifies that he ate breakfast at the depot, about six o'clock in the morning of the date in question.

''There were stockmen in the waiting room of the depot that morning. I don't know whether they were at the lunch counter or not. I heard the stockmen talk about the caboose, and I got up and paid for my breakfast. I recognized Mr. Ducommon and Mr. Hobbs.''

Then follows the testimony which is objected to of this witness, which has been before referred to.

Taking this evidence all together,—and there is more

like it,—we think there was a sufficient foundation to make a prima-facie case of conspiracy justifying the admission of the testimony complained of.

2. EVIDENCE: *res gestae:* series of connected acts.

Furthermore, the transaction in question was not a single act, but extended over some time, and we think, taking the evidence all together, the declarations were a part of the *res gestae* of that transaction.

The judgment is—*Affirmed.*

EVANS, C. J., DEEMER and WEAVER, JJ., concur.